**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jerry Gray, Sr., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> Carolina Energy Solutions, LLC, dba) <br> WEC Carolina Energy Solutions, ) <br> ) <br> Defendant. ) <br> _____) | No. CV-10-0698-PHX-NVW <br><br> **FINDINGS OF FACT,** <br> **CONCLUSIONS OF LAW, and** <br> **ORDER** |

Plaintiff Jerry Gray seeks damages from Defendant Carolina Energy Solutions, LLC ("CES") arising from an alleged breach of an "eligibility for rehire" provision in a settlement agreement. A bench trial was held on June 8 and 9, 2010. This order states the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.   Findings of Fact**

   **A.   Jerry Gray's Background**

Plaintiff Jerry Gray is a 55-year-old pipe welder with approximately 34 years of experience in welding and constructing piping systems and related components primarily in the power and petro-chemical industries. The work often requires extensive domestic and international travel. Since learning the welding trade in 1973, Gray has worked for various employers in a number of capacities, including as a welder, supervisor, foreman,

and assistant project manager. In the welding field, there are typically two types of employment. The first is permanent employment where the welder receives a salary and benefits regardless of whether or not there is work available. The second is casual part-time employment, where the welder is hired for a discrete project, paid by the hour without benefits, and laid off when the project ends. Gray only works on a casual part-time basis because it pays better in the long term.

### B. The Settlement Agreement

One of the various employers for whom Gray has worked since 1989 is PCI Energy Services ("PCI"), a subsidiary of WEC Welding & Machining LLC, which, in turn, is a subsidiary of Westinghouse Electric Company LLC ("Westinghouse"). In 2007, PCI hired Gray to service the Palo Verde Nuclear Generating Station near Wintersburg, Arizona. The station is operated by Arizona Public Service Company ("APS"). On or around August 30, 2007, Gray and six other welders were asked to do a boundary watch shift. When they refused to do so for safety reasons, their employment with PCI was terminated. A PCI employee by the name of Jim Jesko signed off on the termination. A few days later, on September 4, 2007, Westinghouse completed an "Employee Action Change Form" indicating that Gray had been discharged for cause and that he was "not for rehire w/out management review."

All of the terminated welders, including Gray, subsequently filed a complaint with the Arizona Division of Occupational Safety and Health ("ADOSH"), alleging that PCI and APS terminated them in retaliation for voicing concerns about workplace safety. The dispute was mediated and resulted in the signing and adoption of a Settlement Agreement and General Release ("Agreement") on February 6, 2008.

The first page of the Agreement indicates it was entered into by Gray, the other welders, APS "together with its parent, subsidiaries, affiliates, related companies, and their successors and assigns," and PCI "together with its parent, subsidiaries, affiliates, related companies, and their successors and assigns . . . ." Recital C explains that APS terminated the welders' unescorted access to the Palo Verde station's protected area,

recorded the access termination in the Personnel Access Data System (PADS) and inserted a notation in PADS requiring prospective employers to contact APS regarding the incident. Paragraph 5 of the Agreement provides:

> 5. <u>Eligibility for Rehire</u>: Each of the Welders is eligible for rehire with PCI. However, nothing contained in this Agreement or otherwise requires PCI to rehire any of the Welders.

Paragraph 14, entitled "Choice of Law and Forum," further provides that "Arizona law shall govern this Agreement in all respects" and that "state and federal courts in Maricopa County, Arizona, shall have exclusive jurisdiction over any actions that the parties may file to enforce the terms of this Agreement."

### C. Events Involving CES

Defendant CES, like PCI, is a subsidiary of WEC Welding & Machining LLC and therefore a subsidiary of Westinghouse. CES employs welders on both a permanent and casual part-time basis, as necessary. Because they are expected to be available at all times, CES's permanent welders are paid a minimum of 20 hours per week even when they are not working. Therefore, they are the first to be considered when CES staffs a project.

In April 2008, CES hired Gray to work on a welding project in Surry, Virginia, on a casual part-time basis. The hiring decision was initiated by CES's personnel manager, Mike Mankin, who is also Gray's nephew, and was approved by Richard Bryant, President of CES at that time. Gray disclosed the Palo Verde access termination and the legal issues arising therefrom in his written application. He worked on the Surry project for its entire duration, which was about two weeks, after which his employment with CES ended with a clean lay-off.

Gray was subsequently hired by a company known as MTI to work on a project in Missouri on a casual part-time basis. On or around October 9, 2008, Gray returned home to North Carolina because the MTI project was scheduled to end in two to three days and his wife's pacemaker required medical attention. Shortly before Gray's return to North Carolina, Mike Mankin told Gray about another casual part-time position with CES. The

job involved working as a welder superintendent on a steam generator replacement at a nuclear power facility in Angra, Brazil. The Brazil project was originally a Westinghouse project. When Westinghouse needed help, they looked to CES. Timothy Grubbs, the current President of CES, was therefore seeking three to five welder superintendents with steam generator replacement experience. Because he had not yet been to the site, the estimate was based entirely on conversations he had with others.

On or around October 13, 2008, Gray was interviewed by Grubbs at CES headquarters in Rock Hill, South Carolina. At the interview, Grubbs explained that the position would pay $55 per hour, that CES would provide room and board, a rental car, and $75 per day per diem for meals, that overtime would be available, though with no guarantees, and that the project would last approximately four to six months. He also informed Gray that a passport and temporary visa would be required. Over the next two days, Gray completed the appropriate paperwork and otherwise prepared for the job. CES paid for his temporary visa and reserved his flight to Brazil, which was confirmed for Saturday, October 25, 2008. CES also paid Gray for the two days he spent preparing.

Grubbs, who had not yet been to the project site, departed for Brazil on October 14, 2008. Upon arrival at the site, he realized that the project had far exceeded its budget and was suffering serious cost overruns. On or around October 22, 2008, Gray was informed that CES was no longer sending him to Brazil. Josh Russ, a permanent CES welder, was the only one assigned to the project in October 2008, as originally planned. A second permanent CES welder, Jay Warner, joined the project in December 2008, and a third permanent CES welder, Shane Farmer, joined at some point thereafter. All three had steam generator replacement experience. The project eventually ended in or around May 2009. The weekly hours the three superintendents worked varied greatly over the course of the project. Some weeks were forty-hour weeks, others were 50-hour weeks, and still others were 72-hour weeks.

Gray received no other offers of employment until early November 2008, when MTI offered him a casual part-time position. Gray declined the position because he

needed to be with his son, who was seriously ill and passing away.  He learned afterwards that the MTI job would have not have materialized anyway.  Gray was thereafter unable to secure employment until around February 2009.

On January 2, 2009, Gray sued CES in the United States District Court for the District of South Carolina solely for breach of an oral contract of employment.  On summary judgment, the court correctly found the claim meritless in light of the presumption of at-will employment, but nevertheless denied the motion, finding that Gray had adequately pled and asserted a claim for breach of the "eligibility for rehire" provision in the Agreement arising from the Palo Verde incident.  (Doc. # 76.)  CES subsequently moved for reconsideration, or alternatively, for a change of venue pursuant to the Agreement's "choice of law and forum" provision, which specifies that state and federal courts in Maricopa County, Arizona, have exclusive jurisdiction over actions to enforce the Agreement.  (Doc. # 83.)  The court denied the motion for reconsideration, granted the alternative request for a change of venue, and transferred the case to this Court.  (Doc. # 97.)  The theory of liability presented at trial was therefore a last-minute theory predicated entirely on the "eligibility for rehire" provision in the Agreement.

### D. Reason Gray Was Not Sent to Brazil

Gray, Mankin, and Grubbs were the only three witnesses presented at trial.  Beyond the above-stated facts, their testimony as to the occurrence and timing of events leading up to and following CES's decision not to use Gray for the Brazil project is sharply in conflict and largely irreconcilable.  According to Gray, either Josh Russ or Mike Mankin called him on October 22, 2008, and told him that he needed to get in touch with Grubbs.  He therefore called Grubbs that same day, but Grubbs said he was en route to Angra and promised to call on Friday, October 24.  Gray waited and finally called Grubbs on Friday evening, the day before his scheduled departure for Brazil.  During that phone conversation, Grubbs said, "Jerry, what have you done?"  When Gray said, "Nothing," Grubbs said, "You must have done something awful."  When Gray asked for clarification, Grubbs said, "I don't know but my big boss instructed me that you are never

to be rehired again." Gray then told Grubbs about his "paperwork" and his "eligibility for rehire" and said he would be talking to his lawyer. Grubbs said that he could no longer speak with Gray if that was the case. That was the last time they spoke.

According to Mankin, Gray called him on October 23, 2008, told him that Grubbs had just revoked his position on the Brazil project, and asked Mankin to find out what was going on. That same day, Mankin called Grubbs, who, without explanation, said he couldn't hire Gray right now. When Mankin kept pressing, Grubbs told Mankin to remember that he worked for Westinghouse and concluded the conversation by saying, "When you are told you can't hire somebody, you can't hire somebody." That same week, Grubbs asked Mankin whether he knew Gray had been terminated from a job in Arizona. When Mankin responded that he did in fact know about the incident, Grubbs said he wished he had known about it.

According to Grubbs, the decision not to use Gray for the Brazil project was based purely on financial considerations. When Grubbs arrived at the site, he discovered that the project was in a far more dire financial condition than what he had originally anticipated. Due to the budget crunch, he decided to hire only three permanent CES welders. Grubbs therefore told Josh Russ to inform Gray he was no longer needed for the job. Grubbs admits to a brief telephone conversation with Gray around October 22 in which he indicated he was too busy to speak, but denies both the occurrence and content of the October 24 conversation with Gray. Grubbs also denies having any conversations with Mankin about why Gray was not hired and denies having any knowledge of the Palo Verde incident prior to this lawsuit. Finally, Grubbs insists that no one told him not to hire or otherwise employ Gray.

The testimony of the three witnesses is reconcilable in certain respects. In that vein, the Court finds that Josh Russ was the first to inform Gray that he was not going to Brazil and that he did so on October 23, 2008. The Court further finds that Gray called Mankin that same day to ask him to investigate and that he also had a brief conversation with Grubbs, in which Grubbs indicated he was too busy to speak at that time.

The remaining findings must turn on credibility and plausibility determinations. While the Court is persuaded on balance that Grubbs and Gray had a phone conversation on October 24, 2008, in which Grubbs told Gray he was not going to Brazil, the Court finds most of the remainder of Gray's testimony about the content of the conversation not credible for two reasons. First, the general veracity of Gray's testimony is questionable in light of his overall demeanor and his obvious backtracking, at trial, as to whether he had quit other employment in anticipation of the Brazil project. Second, while it is possible that Grubbs expressly told Gray that his "big boss" had forbidden the rehiring, it is highly improbable.

As for whether the October 23, 2008, conversation between Grubbs and Mankin occurred, the Court finds that it did. Mankin, who is both Gray's nephew and a current CES employee who works closely with Grubbs, was the most neutral of the three witnesses. Moreover, his demeanor at trial suggested he was the most credible. For these same reasons, the Court is persuaded that Mankin and Grubbs had a second conversation sometime that same week in which Grubbs asked Mankin about Gray's involvement in the Palo Verde incident.

The above findings do not themselves answer the ultimate factual issue in this case: what motivated CES's decision not to use Gray for the Brazil project? The factual findings thus far support two possibilities. The first, and that proposed by Gray, is that some unidentified CES employee with final hiring authority instructed Grubbs not to employ Gray in light of the Palo Verde incident. The second, and that proposed by CES, is that Grubbs decided not to use Gray solely for financial reasons, including budget overruns that prevented him from hiring the three to five welders he originally anticipated hiring, and the fact that the other candidates for the job were permanent CES welders who would have to be paid at least 20 hours a week regardless.

On balance, the Court is not persuaded that CES's decision was more probably than not motivated by the Palo Verde incident. Grubbs' conversations with Mankin are entirely consistent with both positions and the Court is not persuaded to draw inferences

from those conversations in Gray's favor. Moreover, the undisputed facts show that CES did in fact rehire Gray prior to the Brazil project. Specifically, Gray was employed by CES on the Surry, Virginia, project, which he completed in its entirety. While it is possible that the individuals responsible for hiring Gray for the Virginia project were not aware of the Palo Verde incident, it is improbable in light of the fact that Gray disclosed the Palo Verde incident in his written application.

Several additional uncontroverted facts weigh against Gray's position: (1) the project had significantly exceeded its budget, (2) Josh Russ was the only welder actually assigned to the project in October 2008, and (3) Josh Russ is a permanent CES welder who would have to be paid 20 hours a week irrespective of whether he was assigned to the project. In light of the uncontroverted financial crunch CES was facing, the Court finds it more likely that Gray was not hired for financial reasons wholly unrelated to the Palo Verde incident.

### III. Conclusions of Law

Pursuant to the Agreement's "choice of law and forum" provision, Arizona law governs all substantive aspects of this case. To establish a claim for breach of contract in Arizona, a plaintiff must prove the existence of an enforceable contract, a breach of that contract, and damages caused by the breach. *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170, 83 P.3d 1103, 1111 (Ct. App. 2004). Damages must be proved to a degree of "reasonable certainty." *Id.* (citing *Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981). Moreover, damages are recoverable only to the extent the plaintiff took reasonable steps to avoid or mitigate any loss caused by the breach. *See Northern Arizona Gas Serv., Inc. v. Petrolane Transp.,* Inc., 145 Ariz. 467, 477, 702 P.2d 696, 706 (Ct. App. 1984); RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981).

It is undisputed that the Agreement in this case is an enforceable contract and that the "eligibility for rehire" provision is an enforceable provision therein. At issue is whether CES breached the "eligibility for rehire" provision in denying Gray the

opportunity to work on the Brazil project and, if so, whether Gray has proved that the breach caused damages.

**A. Breach**

The "eligibility for rehire" provision in the Agreement provides, "Each of the Welders is eligible for rehire with PCI. However, nothing contained in this Agreement or otherwise requires PCI to rehire any of the Welders." When construing an agreement under Arizona law, courts must give effect to the intent of the parties at the time the agreement was made. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993). It is undisputed that the Agreement was the result of a mediation between Gray, PCI, and APS of a dispute that arose from PCI's termination of Gray's employment in Arizona and Gray's subsequent ADOSH complaint. However, because there is no evidence of the negotiations that led to the adoption of the Agreement and its "eligibility for rehire" provision, the parties' intended meaning of that specific provision must be drawn from the document itself in light of the backdrop against which it arose.

In construing a contract, courts must "apply a standard of reasonableness" and construe the contract "in its entirety and in such a way that every part is given effect." *State ex rel. Goddard v. R.J. Reynolds Tobacco Co.*, 206 Ariz. 117, 120, 75 P.3d 1075, 1078 (Ct. App. 2003). As it relates to other potential employers, it appears that the general purpose of the provision is to ensure that PCI will serve as a positive rather than a neutral or negative reference. As it relates to PCI and its affiliates, there is only one reasonable interpretation. That is, while PCI and its affiliates are not obligated to rehire Gray, they may not refuse to consider him as a candidate solely because: (1) his employment in Arizona was terminated, (2) he was denied unescorted access to the Palo Verde Nuclear Generating Station, or (3) he filed an ADOSH complaint against PCI and APS. PCI and its affiliates are therefore liable for breach of the provision only if they refuse to consider Gray as a candidate for employment for one of the above three reasons and the refusal results in failure to hire with accompanying damages.

Here, Gray has failed to establish by a preponderance of the evidence that CES's decision not to employ him for the Brazil project was motivated by one of the three prohibited reasons. As explained in the above-stated findings of fact, Gray's contention that he was not hired due to the Palo Verde incident is possible but not probable. Therefore, he has failed to demonstrate that CES breached the Agreement's "eligibility for rehire" provision.

### B. Causation/Damages

Even if CES did breach the "eligibility for rehire" provision by refusing to consider Gray for the Brazil project due to his involvement in the Palo Verde incident, Gray has not demonstrated by a preponderance of the evidence that the breach caused damages. At trial, his evidence of 2009 damages was excluded for failure to disclose pursuant to Fed. R. Civ. P. 26(a). Therefore, only 2008 damages are at issue.

Gray has failed to prove reliance damages because he did not give up other employment or otherwise incur expenses in order to work for CES on the Brazil project. His decision to return home to North Carolina several days before his interview with Grubbs was motivated by two things, neither of which was the prospect of working for CES. First, his employment with MTI in Missouri was ending in roughly two days, and second, his wife required medical attention. Therefore, to the extent Gray left the MTI project before it ended, his decision to do so was not in reliance on the CES employment opportunity. There is also no evidence whatsoever that Gray received and turned down other offers of employment between the date of his interview and the time CES informed him he was not going to Brazil. He admits that he did not quit any MTI position and did not tell MTI that he would be unavailable due to the CES project. Finally, Gray incurred no out-of-pocket expenses in reliance on his assumed employment with CES. CES paid for Gray's temporary visa, reserved his flight to Brazil, and even compensated him for the two days he spent completing paperwork and otherwise preparing for his trip to Brazil.

As for expectancy damages, assuming *arguendo* that CES refused to consider Gray for employment in breach of the "eligibility for rehire" provision, Gray has not

- 10 -

established that he would have worked on the Brazil project, in 2008, but for the breach. It is undisputed that Josh Russ was the only welder sent to Brazil in October 2008, as originally planned. Jay Warner, the second permanent CES welder to join the project, did not arrive until December and Shane Farmer, the third, did not join until sometime thereafter. Gray has not proved that had he been considered for the job, as required by the "eligibility for rehire" provision, he would have been the first, second, or even the third welder assigned to the project.

To the contrary, the fact that Gray was a casual part-time welder suggests he would have been at the bottom of the list. In light of the undisputed budget overruns the Brazil project was facing, it made perfect business sense for CES to assign permanent CES welders, who would have to be paid 20 hours per week regardless, before assigning Gray to the project. All three of the CES welders who worked on the project at some point were permanent CES welders with steam generator replacement experience. Therefore, the claim alternatively fails for lack of causation and damages.

IT IS THEREFORE ORDERED that the Clerk enter judgment against Plaintiff and in favor of Defendant and that Plaintiff take nothing. The Clerk shall terminate this action.

DATED this 6th day of July, 2010.

_____
Neil V. Wake
United States District Judge